[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: MOTION TO SUPPRESS
The defendant challenges the legality of the search of an automobile which he was operating at approximately 2:20 P.M. on January 8, 1992 on I-84 in the town of Tolland, which resulted in the seizure of approximately 933 packages of heroin found in the trunk of the vehicle. There are two issues to be determined in order to resolve this motion.
First: Was the initial stop and detention of the defendant legally justified? CT Page 10154
On January 8, 1993 at the 8:00 A.M. roll call, then Trooper Gregory Post of the Connecticut State Police received information via teletype from the police in New York stating an anonymous tipster informed them that either a 1988 Chevrolet Celebrity four-door sedan with a Massachusetts registration 939-DBP or a newer model maroon four-door Oldsmobile would be transporting narcotics from New York City to the Boston area sometime that morning. The tip also related that the vehicle would be occupied by two Hispanic males and one Hispanic female and that the drugs might be in a concealed compartment in the vehicle.
Trooper Post was on the alert for a vehicle matching either description and shortly after 2:00 P.M. he observed a red Oldsmobile Cutlass on the highway traveling eastbound in the direction of Boston. The car was occupied by two Hispanic males and one Hispanic female. The vehicle was a 1981 two-door model.
Using his police radio Trooper Post requested registration information for Massachusetts plate 476 VSA (the plate on the vehicle). He was told that the vehicle was registered to a Gerardo Rosario, 146 Main Street, Worcester, Massachusetts, that Mr. Rosario's license was under suspension in Massachusetts and that Rosario had numerous drug convictions or arrests in Massachusetts. At that point Trooper Post stopped the vehicle.
While there were discrepancies in the vehicle's description, to wit, it was not newer than a 1988, it was not a four-door and it was described as red, not maroon, there were other indicia which could lead a trained police officer to be suspicious. There is latitude in conducting an investigative stop. Additionally, in this case the vehicle was not stopped until Trooper Post received additional information that the owner was under suspension. At that point there was sufficient articulable suspicion to stop the vehicle to at least check out the operator. State v. Anderson,24 Conn. App. 438, 431 (1991), State v. Lamme, 216 Conn. 172, 184
(1990), State v. Kyles, 221 Conn. 643, 660 (1992). The Court finds that the initial stop was not unlawful.
Second: Did the defendant knowingly and voluntarily consent to the search of the vehicle?
This is a factually driven question to be determined by the totality of the circumstances. Schneckloth v. Bustamonte 412 U.S. 218,232-233, with the burden of proving voluntariness on the CT Page 10155 State. State v. Adam, 176 Conn. 138, 14 (1978).
The defendant presented the testimony of Julia Ramos-Grenier, a clinical and forensic neurological psychologist. Dr. Ramos-Grenier evaluated the defendant's ability to read and write both in English and Spanish, and his ability to understand the spoken word. She concluded that he has average intellectual functioning, but that he did not have the capacity to read or comprehend a legal document in English.
She concluded further that his ability to understand English is limited to the most primitive or simple terms such as "stand, don't move, sit down." His mother also testified to his inability. to speak or understand English.
Dr. Ramos-Grenier's conclusions were contradicted by testimony of police officers actually present at the scene. There was no question at the scene of the defendant's ability to communicate in English, and to do so well beyond the simplest terms to which Dr. Ramos-Grenier testified.
When Trooper Post pulled the defendant over he asked for his license and registration. Mr. Rivera responded that he left his license in Boston and he showed the registration from the glove box. Rivera asked Trooper Post if he had to go to court for the traffic citation he received and the trooper explained how to mail the infraction ticket in. Rivera was asked to get out of the car and he did so. He told Post he was coming from Hartford. While standing outside he said he was cold and asked to sit in the car.
When seated in the cruiser, Rivera initiated a conversation with Trooper Albert by asking him how long he had been a cop, if he worked out or lifted weights. He complained that his cuffs were too tight and asked to have them loosened. When Trooper Albert told him he couldn't, he sighed. He said he was tired because he did not get much sleep the previous night.
When Trooper Post asked for his consent to search the car he responded go ahead, he was clean. Trooper Post showed Rivera the consent form and explained that he did not have to allow the search. In fact he was warned several times and Rivera insisted he had nothing to hide.
All these conversations were in English. Rivera never said he did not understand and, in fact, initiated conversations. He was CT Page 10156 shown the consent form, was asked to read it and sign it if he agreed. The consent was explained to Rivera and his right to refuse consent was explained to him. All of his responses were appropriate to the discussions between them.
A third trooper at the scene also communicated in English with Mr. Rivera and he stated Rivera understood his directions and responded appropriately.
Mr. Rivera saw Dr. Ramos-Grenier for the purpose of supporting his claim that he did not freely consent to the search of the vehicle. At the time of the search, before the question was broached, and when he could be expected to be candid about any lack of understanding of the English language, he communicated freely, rationally and in conversational English with the police officers.
The Court finds the testimony of the police officers to be convincing and persuasive. The State has met its burden of proving that the defendant consented voluntarily, freely and knowingly to the search of the automobile he was operating.
Based on the totality of the circumstances, the police were justified in stopping this vehicle. While the anonymous tip was not precise in all respects, a brief investigative stop was reasonable based on the similarities reported. The added factors of the operator without a license, the owner having a drug history made the officer's request to look in or through the car appropriate and the defendant was willing to having it done.
According, the Motion to Suppress is denied.
Klaczak, J.